IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | * | |
| | * | |
| v. | * | CRIMINAL NO.: WDQ-13-0662 |
| | * | |
| ELMAR RAKHAMIMOV, *et al.*,<br>Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

On December 3, 2013, Elmar Rakhamimov,[1] Zarakh Yelizarov,

Salim Yusufov, Artur Zakharyan, Ilgar Rakhamimov, Nikolay

Zakharyan, Adam Azerman, Shamil Novakhov, and Ruslan Ykiew were

charged with conspiracy to traffic in contraband cigarettes[2] and

trafficking in contraband cigarettes,[3] along with other

offenses.[4] ECF No. 1.[5] All of the defendants either pled or

---

[1] Because many of the parties to the alleged cigarette
trafficking scheme underlying these charges have the same last
name, they will be referred to throughout the remainder of this
opinion by their first initial and last name.

[2] 18 U.S.C. § 371(2012).

[3] 18 U.S.C. § 2342(a)(2012).

[4] Two other defendants, Yuliya Rakhamimov and Timur Yusufov, were
also charged in the indictment; however, Y. Rakhamimov was not
included in the cigarette trafficking offenses that are the
focus of this opinion, and the charges against T. Yusufov have
been dismissed. *See* ECF Nos. 1, 201.

were found guilty of a cigarette trafficking offense. Pending
against six of the defendants is the Government's motion for
restitution.[6] ECF No. 340. For the following reasons, the Court
will defer ruling on the motion pending the presentation of
evidence at the defendants' sentencing hearings, and additional
briefing in the case of R. Ykiew.

I.   Background[7]

This case began as a federal investigation into healthcare
fraud at Healthway Pharmacy in Maryland, a business owned by S.
Yusufov. *See* ECF No. 344 at 2. During the course of the
investigation, the FBI began running a "reverse sting" operation
with the help of a "confidential human source." *Id*. at 3. The
confidential human source arranged with E. Rakhamimov and S.

---

[5] On March 10, 2015, A. Zakharyan and N. Zakharyan were charged
with the same offenses by superseding indictment. ECF No. 214.
The superseding indictment mirrors the original indictment in
its factual allegations. *See id*. The superseding indictment
was filed after the remaining defendants' cases were resolved
through plea agreements, deferred prosecution agreements, or
dismissal. *See* ECF Nos. 123, 139, 143, 190, 191, 201, 212, 218,
229, 241.

[6] The Government seeks restitution for the State and City of New
York from A. Zakharyan, S. Novakhov, Z. Yelizarov, R. Ykiew, A.
Azerman, and N. Zakharyan.

[7] The Court included a detailed recitation of the facts of this
cigarette trafficking scheme in a prior opinion. *See United
States v. Zakharyan*, No. WDQ-13-0662, 2015 WL 1622093, at *1-5
(D. Md. Apr. 9, 2015). Accordingly, the Court will only provide
a summary of the relevant facts and procedural background as
they relate to this restitution opinion.

Yusufov to sell them contraband cigarettes.[8]  On 18 occasions

between December 7, 2011 and November 7, 2013, government agents

sold E. Rakhamimov contraband cigarettes.  ECF No. 1 at 13-14.

These sales included 3,924 "master cases" of cigarettes, which

amounts to 191,340 cartons of cigarettes.  *See id.*

E. Rakhamimov "was the leader and organizer of the scheme."

ECF No. 191 at 12.  After purchasing the contraband cigarettes,

E. Rakhamimov would "typically" have them stored at his home in

Owings Mills, Maryland.[9]  *Id.*  There, E. Rakhamimov and his co-

conspirators arranged for the cigarettes to be transported to

Brooklyn, New York for resale.[10]  *Id.*  On December 3, 2013, the

co-conspirators were indicted on one count of conspiracy to

---

[8] The term "contraband cigarettes" means a quantity of cigarettes
"in excess of 10,000 cigarettes, which bear no evidence of the
payment of applicable State or local cigarette taxes in the
State or locality where such cigarettes are found, if the State
or local government requires a stamp, impression, or other
indication to be placed on packages or other containers of
cigarettes to evidence payment of cigarette taxes."  18 U.S.C. §
2341(2).

[9] When the FBI executed a search warrant for the Owings Mills
home in December 2013, investigators found "numerous master
cases of the contraband cigarettes that were provided by [the
confidential human source], as well as 3 master cases of
contraband Davidoff cigarettes containing 111 cartons."  ECF No.
209 at 16-17.  Investigators recovered another nine master cases
from the home of N. Zakharyan.  *Id.*

[10] The FBI recovered 150 cases of contraband cigarettes from a
warehouse in Brooklyn, New York as part of the investigation.
ECF No. 209 at 16-17.  "Of the cases, at least 75% were
contraband cigarettes that had been provided by [the
confidential human source]."  *Id.*

3

traffic in contraband cigarettes in violation of 18 U.S.C. § 371 and multiple counts of trafficking in contraband cigarettes in violation of 18 U.S.C. § 2342(a). ECF No. 1.

On June 6, 2014, A. Azerman pled guilty to conspiracy to traffic in contraband cigarettes as part of a plea agreement with the government. ECF No. 123. A. Azerman admitted that he had assisted in transporting contraband cigarettes to New York, and included two "examples" of such conduct.[11] *Id.* at 9-10. As part of the plea, A. Azerman agreed to pay restitution "for the full amount of the victims' losses . . . caused by the offense conduct set forth in the factual stipulation." *Id.* at 5.

On October 23, 2014, R. Ykiew also pled guilty to conspiring to traffic in contraband cigarettes. ECF No. 139 at 1. R. Ykiew's plea was similar to A. Azerman's; except, R. Ykiew's plea did not include a restitution clause, and R. Ykiew agreed that the "state and local excise tax due on the cigarettes that were transported to New York during the course of the conspiracy was over $7,000,000," and the "New York state excise tax due on the contraband cigarettes from the transactions that [he] participated in was in excess of $400,000." *Id.* at 8-10.

---

[11] In the "examples," the plea agreement details two occasions on which A. Azerman helped transport the cigarettes. The plea does not state that these were the only times that A. Azerman participated in the conspiracy, nor does it state on how many other occasions he helped transport the cigarettes.

4

On November 14, 2014, S. Novakhov pled guilty to conspiracy to traffic in contraband cigarettes. ECF No. 143 at 1. S. Novakhov's plea agreement included the restitution provision in A. Azerman's plea agreement, and the factual stipulation about the amount of loss from R. Ykiew's plea agreement. *Id.* at 5, 8-10. I. Rakhamimov, Z. Yelizarov, and A. Zakharyan also entered into plea agreements, none of which included a restitution clause.[12] ECF Nos. 218, 229, 246. I. Rakhamimov's and A. Zakharyan's pleas stipulated that the "state and local excise tax due on the cigarettes that were transported to New York during the course of the conspiracy was more than $2,500,000." ECF No. 229 at 9-10, ECF No. 246 at 9-10.

On January 29, 2015, E. Rakhamimov pled guilty to conspiracy to traffic in contraband cigarettes and other charges in the indictment. ECF No. 191 at 1. As part of the plea agreement's restitution clause, E. Rakhamimov agreed to pay the full amount of the victims' losses from funds seized by the government. *Id.* at 8. The parties agreed that the total amount of the victims' losses was $400,000. *Id.* Later, I. Rakhamimov entered into a similar agreement with New York in which he

---

[12] On January 29, 2015, S. Yusufov pled to the conspiracy to traffic contraband cigarettes; however, no plea agreement was filed on the docket. ECF No. 190.

agreed to pay $50,000 in restitution for New York's losses.[13]
*See* ECF No. 340 at 1; ECF No. 344 at 13-14.

On April 29, 2015, a jury found N. Zakharyan guilty of
conspiracy to traffic in contraband cigarettes and ten counts of
trafficking in contraband cigarettes. ECF No. 286. On June 10,
2015, the Court sentenced R. Ykiew. ECF No. 320. As part of
the sentence, the Court ordered restitution in an "amount to be
determined." *Id*. On July 8, 2015, the Court cancelled all
further sentencing hearings unless "the government and [each]
defendant [were] able to reach an agreement on restitution."
ECF No. 337. For defendants who could not reach an agreement
with the government, the Court ordered briefing on restitution.
*Id*.

On July 23, 2015, the Government submitted its opening
restitution brief.[14] ECF No. 340. From the six remaining
defendants, the government sought restitution under the
Mandatory Victims' Restitution Act ("MVRA")[15] for New York City
and New York State in amounts ranging from two million to 12

---

[13] Because of these agreements, the government is not seeking a
determination of the restitution due from the Rakhamimovs. *See*
ECF No. 340 at 1.

[14] Although the government submitted its brief and reply, the
memorandums of law were both written by Corporation Counsel of
the City of New York on behalf of New York City and State.

[15] 18 U.S.C. § 3663A, *et seq*.

6

million dollars.[16] *Id.* at 1. For its calculations, the government multiplied the number of cartons of cigarettes sold to the co-conspirators by the confidential human source by $66.00.[17] *Id.* The government then subtracted $450,000 from each restitution total to reflect the restitution paid by the Rakhamimovs. *See id.*

On August 20, 2015, the defendants filed their responsive brief.[18] ECF No. 344. The defendants argued that New York was not a victim under the MVRA, the government's restitution calculations were flawed, and the disparate restitution amounts between the Rakhamimovs and the remaining defendants were fundamentally unfair. *See id.* On September 9, 2015, the government filed its reply.

---

[16] The government recognized that each defendant could only be held responsible for restitution for acts that occurred after he entered the conspiracy. ECF No. 340 at 1. Thus, each defendant had a separate restitution calculation for the total amount of the loss caused while he was engaged in the conspiracy.

[17] At the time of the conspiracy, New York State taxed each carton of cigarettes by $43.50, plus $8.10 in sales tax. New York City imposed a tax of $15 per carton. ECF No. 340-1 at 27. This amounts to $66.60 in taxes per carton of cigarettes, which the government rounded down to $66.00. There are typically ten packages in one carton of cigarettes.

[18] The responsive brief was filed on behalf of A. Zakharyan by his counsel. The other defendants believed they were joining the brief; however, in its reply, the government argued that the Court should order restitution for all defendants other than A. Zakharyan because they had failed to respond. ECF No. 351-1 at 1. In a telephone conference call on September 29, 2015, the Court permitted all the defendants to join in A. Zakharyan's opposition.

II.  Analysis

   A. Restitution Statutes

   "A district court may order criminal restitution only as
authorized by federal statute."  *United States v. Ferdman*, 779
F.3d 1129, 1131 (10th Cir. 2015).[19]  The Victim Witness
Protection Act ("VWPA")[20] and the MVRA are the two federal
restitution statutes.

   Under the VWPA, a court "may order . . . that the defendant
make restitution to any victim" of an offense.  18 U.S.C. §
3663(a)(1)(A) (emphasis added).  Although an order of
restitution under the VWPA is discretionary, a court must
consider "the financial resources of the defendant, the
financial needs and earning ability of the defendant and the
defendant's dependents, and such other factors as the court
deems appropriate."  18 U.S.C. § 3663(a)(1)(B)(i)(II).
"[F]ailure to make the required findings necessitates remand."
*United States v. Blake,* 81 F.3d 498, 505 (4th Cir. 1996).

   In contrast to the VMPA, "the MVRA mandates that the
sentencing court order restitution in the full amount of the
victim's loss when the defendant has been convicted of certain

---

[19] *See also United States v. Leftwich*, 628 F.3d 665, 667 (4th
Cir. 2010) ("Discretion in ordering restitution 'is
circumscribed by the procedural and substantive protections' of
the statute authorizing restitution." (quoting *United States v.
Henoud,* 81 F.3d 484, 487 (4th Cir. 1996)).

[20] 18 U.S.C. § 3663, *et seq.*

specified offenses." *United States v. Leftwich*, 628 F.3d 665, 668 (4th Cir. 2010). "[T]he court shall order restitution to each victim in the full amount of each victim's losses . . . and *without consideration of the economic circumstances of the defendant.*" 18 U.S.C. § 3664(f)(1)(A) (emphasis added).[21] The Fourth Circuit has found that the MVRA "dictate[s] that a district court cannot remit a mandatorily imposed restitution order." *United States v. Roper*, 462 F.3d 336, 338-39 (4th Cir. 2006). "Thus, the district court is precluded from ordering restitution in any amount less than the full amount of the victim's loss." *Leftwich*, 628 F.3d at 668.

The purpose of restitution is "restoring victims to the position they occupied before the crime." *Ferdman*, 779 F.3d at 1132 (citing *Hughey v. United States*, 495 U.S. 411, 416 (1990)). "Restitution must not unjustly enrich crime victims or provide them a windfall." *Id.* Thus, "an order of restitution [must] be

---

[21] Although a court may not consider a defendant's ability to pay in ordering restitution under the MVRA, the statute mandates that the defendant's payment schedule be made "in consideration of—(A) the financial resources and other assets of the defendant, including whether any of the assets are jointly controlled; (B) projected earnings and other income of the defendant; and (C) any financial obligations of the defendant; including obligations to dependents." 18 U.S.C. § 3664(f)(2). The Fourth Circuit has interpreted "his provision as requiring the district court to make factual findings keying the payment schedule to these factors and demonstrating the feasibility of the schedule." *Leftwich*, 628 F.3d at 668.

based on actual loss, rather than intended loss."[22] *United States v. Squirrel*, 588 F.3d 207, 212 (4th Cir. 2009). However, in cases involving multiple defendants, "18 U.S.C. § 3664(h) explicitly gives a district court discretion as to whether joint and several liability should apply or whether liability should be apportioned among the defendants based on their economic circumstances and their respective contributions to the victim's losses."[23] *Id.*

"The government bears the burden of demonstrating by a preponderance of the evidence the amount of actual loss sustained by the victim."[24] *Squirrel*, 588 F.3d at 213. "In determining the amount of actual loss for purposes of imposing

---

[22] Unlike calculating loss under the Sentencing Guidelines, in which loss may be estimated, calculating loss under the MVRA must be done with "some precision," although "exact precision" is not required. *Ferdman*, 779 F.3d at 1133. "Issuing an order of restitution unsupported by the evidence is not an option." *Id.*

[23] "If the court finds that more than 1 defendant has contributed to the loss of a victim, the court *may* make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and [the] economic circumstances of each defendant." 18 U.S.C. § 3664(h) (emphasis added).

[24] Although the government carries the burden for proving the amount of the victims' losses, the defendant has the "burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents." 18 U.S.C. § 3664(e). "The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires." *Id.*

10

restitution under the MVRA, the district court is the trier of fact." *Id.* Calculating loss under the MVRA must be done with "some precision," although "exact precision" is not required. *Ferdman*, 779 F.3d at 1133.

In difficult cases, in which a court does not have the evidence needed to calculate actual loss, the court may "require additional documentation or hear testimony," 18 U.S.C. § 3664(d)(4); allow additional time "for the final determination of the victim's losses, not to exceed 90 days after the sentencing," *id.* § 3664(d)(5); or "refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendation as to disposition," *id.* § 3664(d)(6). "Ultimately, if the court finds that 'complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process' then the court may, in the exercise of its sound discretion, decide not to order restitution at all." *United States v. Zangari*, 677 F.3d 86, 93 (2d Cir. 2012) (quoting 18 U.S.C. § 3663A(c)(3)(B)).

B. New York City and State as "Victims"

A victim under the MVRA is any "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).[25] The defendants assert that New York City and New York State are not "victims" within the meaning of the MVRA because there is no direct "causal connection" between the defendants' actions and the victims' losses, and New York actually benefitted from the scheme. ECF No. 344 at 4-8.

First, the defendants argue that "any tax loss to New York was directly and proximately caused by the FBI's decision to initiate a reverse sting operation--not by the defendant[s'] conduct." ECF No. 344 at 5. In essence, the defendants assert that because the government introduced the contraband cigarettes into commerce, the government is at fault for all subsequent losses by victims. *See id.* at 5-6.

---

[25] The defendants never argue that MVRA does not apply to the crimes with which they were charged. *See* ECF No. 344 at 1-4. In similar contraband cigarette conspiracies, other courts have held that states may recover lost taxes under the MVRA. *See, e.g., United States v. Conway*, 323 F. App'x 517 (9th Cir. 2009).

12

In support of this argument, the defendants cite a string of cases in which courts determined that the government was not a victim under the MVRA when it was seeking restitution to *reimburse* investigatory expenses. *See id.* at 6-7. For example, in *United States v. Gibbens*, 25 F.3d 28, 29-33 (1st Cir. 1994)-- the case that the defendants assert is "most closely analogous" to the case at hand--the U.S. Department of Agriculture ("USDA") sold the defendant food stamps at a discounted rate, which the defendant subsequently resold. The USDA then sought restitution to recover the difference between the face value of the food stamps and the amount the defendant paid for them. *Id.*

The First Circuit recognized that the government may be a "victim" entitled to restitution "when it has passively suffered harm resulting directly from the defendant's criminal conduct, as from fraud or embezzlement." *Id.* (quotation omitted). However, the government "is not a 'victim' for purposes of VWPA (and may not be awarded restitution) to the extent that it incurs costs in the clandestine provocation of a crime that, if carried to fruition under ordinary circumstances, would not directly harm the government." *Id.* "[I]nvestigatory costs do not constitute a 'loss' within the purview of the Act because such costs are best conceived as voluntary outlays for the procurement of evidence." *Id.*

13

The *Gibbens* court determined that the USDA's request fell "somewhere between the two ends of the spectrum," because "the difference between the face value of the food stamps and the amount appellant paid for them was *both* a calculated consequence of the defendant's crime and a calculated cost of the government's investigation." *Id.* Because the statute and case law were unclear on this issue, the First Circuit held that the rule of lenity mandated that the restitution order be denied.

Neither *Gibbens* nor any of the other cases cited by the defendants support their argument that New York is not a victim in this case. New York is not seeking reimbursement for investigatory expenses, and New York was never involved in the investigation or the sale of the contraband cigarettes. *See Gibbens*, 25 F.3d at 32-33 (A government may be a 'victim' entitled to restitution "when it has passively suffered harm resulting directly from the defendant's criminal conduct, as from fraud or embezzlement.").

The defendants' argument that the federal government was the direct cause of New York's harm also lacks merit. The federal government was not involved in the defendants' decision to transport the cigarettes to New York. It was this decision that resulted in New York's losses, and that decision was the defendants'.

Next, the defendants contend that New York City and New York State are not victims because there was no "harm" from "the sting operation." ECF No. 344 at 8. The defendants assert that New York ultimately *benefitted* from the scheme because "the goal and ultimate effect of [the investigation was] rooting out and deterring the introduction of untaxed cigarettes into the New York market." *Id.* Because this benefit outweighs any tax loss, the defendants argue, there was no victim. *See id.*

There is no basis in the MVRA for this type of comparative benefits analysis. To adopt the defendants' definition of "victim" would counter restitution's primary goal of "restoring victims to the position they occupied before the crime." *Ferdman*, 779 F.3d at 1132. Moreover, the defendants' argument would effectively negate the definition of "victim" in all restitution cases because all victims benefit in some way from the investigation and arrest of a perpetrator.

Because New York City and New York State suffered harm that was directly and proximately caused by the defendants' conduct, they are victims under the MVRA.

C. The Defendants' Fairness Argument

The defendants also argue that the Court should decline to issue an order of restitution because "the proposed two-tiered restitution framework is inequitable and unlawful." ECF No. 344 at 13. By "two-tiered framework," the defendants mean the

15

$450,000 in restitution paid by the Rakhamimovs--one of whom was in charge of the conspiracy--versus the millions of dollars requested of the defendants. *See id.* The defendants argue that these agreements were fundamentally unfair because the Rakhamimovs had the funds to reach an agreement and immediately pay restitution, while the remaining defendants were indigent and lacked such means. *Id.* at 13-15.

However unfair the arrangement may be, the MVRA does not permit the Court to deny restitution on that basis. The statute mandates that the Court *must* order restitution in the full amount of the victims' losses, regardless of a defendant's ability to pay. *See Leftwich*, 628 F.3d at 668. Moreover, "'each member of a conspiracy that in turn causes property loss to a victim is responsible for the loss caused *by the offense*,' not merely for the loss occasioned by h[is] overt acts." *United States v. Hughes*, 484 F. App'x 766, 768 (4th Cir. 2012). Thus, the statute contemplates cases in which defendants shall be held jointly and severally liable for restitution in amounts exceeding losses directly caused by their participation in the offense and financial capabilities. *See id.*

To the extent that the defendants want the Court to exercise its discretion to "among the defendants . . . reflect the level of contribution to the victim's loss and economic

circumstances of each defendant,"[26] each may present the evidence

of his individual culpability, and the amount of restitution

associated with that culpability at the sentencing hearings.[27]

D. The Government's Calculations

Finally, the defendants argue that the requested

restitution is not substantiated by the evidence. ECF No. 344

at 9. The government's calculations are based on the number of

cigarettes sold to the co-conspirators in Maryland by the

confidential human source. *See* ECF No. 340 at 1-2. However,

the government has not shown the number of cigarettes that

entered New York.[28]

---

[26] 18 U.S.C. § 2664(h).

[27] "The burden of demonstrating such other matters as the court
deems appropriate shall be upon the party designated by the
court as justice requires." 18 U.S.C. § 3664(e).

[28] The defendants argue that restitution should only be ordered
for the cigarettes that entered the New York market and were
sold. ECF No. 344 at 10-11. The defendants rely on *United
States v. Beydoun*, in which the Fifth Circuit held that a
cigarette company was only owed restitution for the number of
counterfeit cigarettes that were actually sold under the theory
that customers would have bought the company's cigarettes if the
fraudulent ones had not been available. 469 F.3d 102, 107-08
(5th Cir. 2008). In this case, however, New York was not due
the taxes when the cigarettes were sold. Under New York law,
the taxes on the cigarettes were due when the cigarettes were
*possessed* in the city for sale or use. *See* N.Y. Tax L. §§ 471,
471-a; *see also City of New York v. Golden Feather Smoke Shop,
Inc.*, 2013 U.S. Dist. LEXIS 47037, at *44 (E.D.N.Y. Mar. 29,
2013) ("[T]hese cigarettes were subject to a City tax upon their
very entry into the City, and the City was thus deprived of tax
revenue to which it was entitled the moment defendants'
cigarettes were trafficked into the City limits.").

17

The government argues that it is fair to assume that all the cigarettes sold to the co-conspirators by the confidential human source entered New York. *See* ECF No. 351-1 at 10-12. However, the language in the indictment and in the plea agreements is far from precise.[29] For example, the plea agreements say that "the contraband cigarettes" were transported to New York, but do not say that this was all the cigarettes or give precise amounts.[30] *See, e.g.*, ECF No. 191 at 12, ECF No. 218 at 11. Moreover, the government's own representations show that some of the master cases were recovered from E. Rakhamimov's home and never reached New York. *See* ECF No. 209 at 16-17 (investigators recovered "*numerous master cases* of the contraband cigarettes that were provided by [the confidential human source], as well as 3 master cases of contraband Davidoff cigarettes containing 111 cartons") (emphasis added).

---

Accordingly, the government need only show the number of cigarettes that entered New York City.

[29] The indictment states that "some" of the cigarettes were sent to New York, and does not detail their transfer to New York after the last delivery of master cases by the confidential human source. *See* ECF No. 1 at 6-12.

[30] Although a court may rely on stipulated tax losses in a plea agreement in ordering restitution, *Conway*, 323 F. App'x at 518-19, some of the defendants here did not stipulate to such losses, and, even for the defendants who did stipulate to the amount lost, the requested restitution far exceeds those amounts.

The Court is not permitted to order restitution that unjustly enriches a victim, and must make its calculation with "some precision." *Ferdman*, 779 F.3d at 1133. Therefore, the Court cannot rely on the government's assumption that all of the cigarettes traveled to New York, especially as the assumption is contravened by the evidence.

As previously discussed, a court has numerous options if the evidence provided is not sufficient to calculate actual loss.[31] In this case, the Court will provide the government with the opportunity to present evidence of actual loss at each defendant's sentencing hearing.[32] Ten days prior to each sentencing hearing, the government shall provide a memorandum to the Court and defense counsel outlining its evidence and restitution calculations for that defendant.[33]

---

[31] A court may "require additional documentation or hear testimony," 18 U.S.C. § 3664(d)(4); allow additional time "for the final determination of the victim's losses, not to exceed 90 days after the sentencing," *id.* § 3664(d)(5); or "refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendation as to disposition," *id.* § 3664(d)(6).

[32] Because R. Ykiew has already been sentenced, the Court will order additional briefing in his case. *See infra.*

[33] Each defendant will have the opportunity to respond to the government's proposed calculations at the hearing. The defendants may also present evidence of their financial circumstances and individual culpability.

E. R. Ykiew's Sentencing and Restitution

A court may make a final determination of a victim's actual loss for the purposes of restitution within 90 days after sentencing. *See* 18 U.S.C. § 3664(d)(5). However, "a sentencing court that misses the 90-day deadline nonetheless retains the power to order restitution[] at least where . . . the sentencing court made clear prior to the deadline's expiration that it would order restitution, leaving open (for more than 90 days) only the amount." *Dolan v. United States*, 130 S. Ct. 2533, 2536 (2010). The ninety-day time limit "seeks speed by creating a time-related directive that is legally enforceable but does not deprive a [district court] . . . of the power to take the action." *Id*. at 2538-39. "The fact that a sentencing court misses the [MVRA's] 90-day deadline, even through its own fault or that of the [g]overnment, does not deprive the court of the power to order restitution." *Id*. at 2539.

On June 10, 2015, before the government filed its position on restitution, R. Ykiew was sentenced. ECF No. 320. As part of the sentence, the Court ordered restitution in an "amount to be determined." *Id*. Because the Court ordered restitution, and only left open the amount, the Court may still order restitution against R. Ykiew despite exceeding the 90-day deadline.[34]

---

[34] The Court notes that R. Ykiew has never objected to the delay or argued that the 90-day deadline has passed.

Because R. Ykiew's sentencing hearing has already occurred, the government may submit a restitution memorandum within 30 days establishing the number of cigarettes that entered New York while R. Ykiew was a member of the conspiracy.[35] If the government fails to provide any additional evidence, the Court will order restitution for $400,000, as reflected in R. Ykiew's plea agreement, because this is the only amount, as of now, that the government has shown by a preponderance of the evidence.[36] *See Conway*, 323 F. App'x at 518-19 (a court may rely on the stipulated losses in a plea agreement in ordering restitution).

---

[35] After the government submits its brief, R. Ykiew will have 17 days to respond. The government will then have 7 days to reply.

[36] There are only two figures in R. Ykiew's plea purporting to show the amount of loss. R. Ykiew agreed that the amount of "state and local excise tax due on the cigarettes that were transported to New York during the course of the conspiracy was over $7,000,000." ECF No. 140 at 8. However, this is the amount of lost taxes from the entire conspiracy. In its motion, the government only requested $2,834,712 in restitution for R. Ykiew for the transactions that occurred between December 17, 2011 and June 12, 2012. ECF No. 340 at 4.

The only other figure in the plea is R. Ykiew's stipulation that the "New York state excise tax due on the contraband cigarettes from the transactions that [he] participated in was in excess of $400,000." ECF No. 140 at 8-10. Accordingly, absent additional evidence, the Court will order R. Ykiew to pay $400,000 in restitution.

III. Conclusion

For the reasons stated above, the Court will defer ruling on restitution pending the presentation of evidence at the defendants' sentencing hearings, and additional briefing in the case of R. Ykiew.

_11/2/15_
Date

William D. Quarles, Jr.
United States District Judge